Stacie L. COOK, Appellant

v.

Lisha POPPLEWELL, in her Capacity as County Clerk of Russell County, Kentucky and Russell County, Kentucky, Appellees.

No. 2009–SC–000341–DG.

Supreme Court of Kentucky.

Dec. 22, 2011.

James E. Keller, Joseph H. Miller, Huston Barrow Combs, Gess, Mattingly &

Atchison, PSC, Lexington, KY, Counsel for Appellant.

Arden Winter Robertson Huff, Attorneys Services of KY, PLLC, Monticello, KY, Counsel for Appellees.

Opinion of the Court by Justice VENTERS.

Shortly after announcing her intention to, seek election to the office of Russell County Clerk, Appellant, Stacie Cook, was discharged from her position as a deputy clerk by the incumbent Russell County Clerk, Appellee, Lisha Popplewell, who also intended to seek election to the Clerk position. Following Cook's defeat in the primary election, she brought this 42 U.S.C. § 1983 action in the Russell Circuit Court, against Popplewell and Russell County alleging that she had been discharged in violation of her rights under the First and Fourteenth Amendments to the United States Constitution. The circuit court dismissed Cook's complaint by summary judgment, ruling that Cook's interest in being a candidate enjoyed no constitutional protection. The Court of Appeals upheld that ruling and we granted Cook's motion for discretionary review to consider the important constitutional question thus presented.

Upon our last consideration of whether there is a constitutional right to candidacy, in *Com. ex rel. Stumbo v. Crutchfield*, 157 S.W.3d 621 (Ky.2005), we concluded that there was not. Discerning no reason to deviate from our settled law on this point, we affirm the circuit court's awarding of summary judgment in favor of Popplewell and Russell County.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Construing the record in favor of the party opposing the summary judgment, as we must, *Spencer v. Estate of Spencer*, 313 S.W.3d 534 (Ky.2010) (citing *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky.1991)), it appears that Cook began working for the Russell County Clerk's office in about February 2004, when she was hired as a deputy clerk by then-County Clerk, Bridget Popplewell, the Appellee's sister. At that time, Lisha Popplewell was serving as a deputy clerk. Several months later, Bridget resigned from her office, and Lisha Popplewell was appointed to serve as interim County Clerk until the next election in 2006. It was apparently known that Lisha Popplewell intended to retain the office by running in the 2006 election, and at some point in 2005 Cook decided to run for the office as well. Although she had not formally announced her candidacy, Cook states that by August 2005 she had revealed to her co-workers in the County Clerk's office of her decision to run and she had begun to campaign. Those campaign activities included discussing her candidacy and seeking support from people who came to the County Clerk's office to conduct business. However, as further discussed below, Cook does not associate her discharge with any of these activities. Rather, she alleges that she was discharged solely as a result of her status as a candidate seeking to unseat Popplewell—and not for any expressive campaign activities or political affiliations.

Soon after Cook disclosed her intentions to run, on August 16, 2005, Popplewell summarily discharged her. Popplewell maintains that she was not aware of Cook's intention to run against her and that the discharge was for work-related reasons. Cook counters by noting that she had no record of deficient job performance and that the timing of her discharge strongly suggests that the discharge was related to the disclosure of her plan to run. The resolution of that factual point is not

germane to this appeal because, as noted above, upon review of a summary judgment dismissing a claim, we accept the facts as viewed from the claimant's (Cook's) perspective.

Cook then filed the 42 U.S.C. § 1983 action in the Russell Circuit Court. Popplewell, in her official capacity as Russell County Clerk, and Russell County moved for summary judgment on the merits citing these grounds: first, that the discharge of a single employee was not the sort of policy decision that would support official capacity or county liability under 42 U.S.C. § 1983; and second, that under Kentucky law counties and county officials sued in their official capacities enjoy sovereign and official immunity, respectively. In granting Popplewell's motion for summary judgment, the trial court relied on *Carver v. Dennis*, 104 F.3d 847 (6th Cir. 1997), to rule that Cook's discharge did not implicate her constitutional rights.[1] The court also agreed with Popplewell that nothing in the record "indicat[ed] that the County committed any wrong," and further agreed, citing *Yanero v. Davis*, 65 S.W.3d 510 (Ky.2001), that both defendants are immune from suit under Kentucky law.

Cook appealed to the Court of Appeals. Her argument before that Court was that the trial court's reliance on *Carver* was misplaced, that the trial court erred by deeming itself bound by the Sixth Circuit Court of Appeals' decision and also that the trial court erred by following the reasoning in *Carver*, which she argues is misreading of the constitutional issue presented. Although the Court of Appeals recognized that *Carver* was not binding authority, it nevertheless found *Carver* to be persuasive and in accord with decisions from other federal circuits. On that basis, it affirmed the summary judgment. Having resolved the case on the merits, the Court of Appeals declined to address the trial court's immunity ruling. Neither party asked the Court of Appeals to review the trial court's third reason for granting summary judgment: its conclusion that Cook failed to allege a wrong attributable to Russell County. That issue, therefore, is before us only to the extent that it provides alternative support for the trial court's judgment.[2]

## II. THE DEFENDANTS ARE NOT IMMUNE TO COOK'S LAWSUIT

As a preliminary matter, we consider the Appellees' claim that they are immune from Cook's lawsuit under state immunity law.

As noted, Cook brought her complaint pursuant to 42 U.S.C. § 1983, which creates a remedy for violations of federal rights committed by persons acting under color of state law. In pertinent part, the statute provides that:

[e]very person who, under color of any statute, ordinance, regulation, custom, or

---

1. Though *Crutchfield* is otherwise dispositive of the case, the trial court's order awarding summary judgment did not cite that decision.

2. In her concurring opinion, Justice Abramson suggests that we should have avoided the First Amendment issue presented here, and decided the case upon the deficiencies in Cook's § 1983 pleadings, or upon the grounds that Cook's conduct in the workplace may have justified her dismissal. However, even the concurrence notes that the issue we ad-

dress "is properly before us." And, basing an opinion as the concurrence suggests, on Cook's speech and conduct in the workplace does not avoid a constitutional issue, it simply substitutes a different one—one not raised in the petition before us. Finally, and more importantly, in granting review of the issues presented, we recognized an overarching need to resolve this point of law and to state with clarity the reasons for our decision.

usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The United States Supreme Court has explained that while the states themselves and the arms of the state (which have traditionally enjoyed Eleventh Amendment immunity) are not subject to suit under § 1983, subdivisions of the state—such as counties, school districts, and municipalities—are "persons" for the purposes of the statute and may not be shielded from liability by state-created immunities. *Howlett v. Rose,* 496 U.S. 356, 375–81, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990); *Martinez v. California,* 444 U.S. 277, 284, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 ... cannot be immunized by state law.") To the extent, then, that the trial court believed the defendants to be immune from Cook's § 1983 claim under Kentucky immunity law, it was mistaken.[3]

### III. COOK'S § 1983 CLAIM

█ To be entitled to relief under § 1983, Cook must establish: (1) that she has been deprived of a right secured by the Constitution or laws of the United States; and (2) that the defendants, here Russell County and Popplewell in her official capacity as Russell County Clerk, are responsible for the violation. *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). To satisfy the first element of her § 1983 claim, Cook alleged constitutional violations under the First Amendment and the Due Process Clause of the Fourteenth Amendment.

As noted in Section VI., *infra,* Cook's Fourteenth Amendment Due Process argument is not adequately preserved for our review, leaving only her First Amendment claim for our consideration.[4] Thus, with respect to the first requirement for § 1983 relief, as far as we are concerned, Cook alleges only that she was discharged in retaliation for being a candidate in opposition to her boss, and that her firing deprived her of her right to run for political office as guaranteed under the First Amendment.[5]

---

**3.** *Clevinger v. Board of Educ. of Pike County,* 789 S.W.2d 5, 12 (Ky.1990), held that public school boards of education were shielded by state immunity law from liability under 42 U.S.C. § 1983. Although *Howlett* unambiguously abrogated that holding, *see Jefferson County Fiscal Court v. Peerce,* 132 S.W.3d 824, 835 (2004), we nevertheless, as additional guidance, now clarify that *Clevinger* is expressly overruled.

**4.** Cook makes no specific statutory claims or arguments relating to the Kentucky Constitution. Thus this case is decided solely upon this Court's interpretation of the First Amendment of the United States Constitution.

**5.** In her original complaint, Cook alleged a far broader violation of her constitutional rights, stating: "Plaintiff was terminated in violation and contravention of both the Constitution of the Commonwealth of Kentucky and the First and Fourteenth Amendments of the United States Constitution. Specifically, Plaintiff's exercise of the freedom of speech, the freedom to express her political beliefs, the freedom to seek public office, the freedom of association, the exercise of political franchise, the exercise of political patronage, the right of enjoying life and liberty, and the right of freely communicating thoughts and opinions were among the liberties, rights, and privileges to which Plaintiff was entitled that were breached by the Defendants in terminating the employment of Plaintiff." Because Cook makes no claims on appeal in pursuit of these additional alleged infringements, they are deemed to be waived. *Grange Mut. Ins. Co. v. Trude,* 151 S.W.3d 803, 815 (Ky.2004).

## IV. THERE IS NO FIRST AMENDMENT RIGHT TO CANDIDACY

As noted, Cook argues that she is entitled to § 1983 relief because she was discharged for the *exclusive* reason that she undertook a rival campaign to unseat Popplewell as Russell County Clerk, a right she contends is secured by the First Amendment of the United States Constitution.[6] Therefore, pursuant to the concessions made and arguments presented by Cook, the question we address is limited to whether candidacy for political office, standing alone, receives protection under the First Amendment.[7] It follows that our review excludes from consideration the various methods of expressive speech and conduct, and of assembly and association, which occur during the ordinary course of a political campaign. Nor does this case implicate Cook's association with particular political parties, groups, or points of view, or her political opinions or beliefs. Our only concern, therefore, is whether candidacy, standing alone, is a First Amendment right.[8]

To prevail on a retaliation claim stemming from the exercise of First Amendment rights:

> an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination. If the employee discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.... And even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong.

*Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996).

As noted, in *Crutchfield*, 157 S.W.3d 621, we unambiguously held that, in this Court's view, candidacy for political office, standing alone, is not constitutionally pro-

---

6. The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

7. In her deposition testimony, Cook testified that she "believe[d] that [she was] fired *solely* because [she] announced [she] were going to run against [Popplewell] for county clerk." (emphasis added). Similarly, in her opening brief, Cook states as follows: "Stacie contends that her rival candidacy was the *sole* reason for her firing," (emphasis added), and that this appeal presents the following "concise issue[ ]": "Popplewell, the incumbent clerk, fired Stacie, a deputy clerk, because of her rival candidacy. Did Popplewell's firing of Stacie violate her rights under the United States Constitution?"

8. In her separate opinion, Justice Abramson criticizes our consideration of candidacy *per se* (meaning candidacy in isolation, unat-

tached to the forms of expression typically associated with a run for public office) as a "sort of metaphysical" concept undeserving of our attention. However, that is precisely the issue as framed by Cook herself, who by her own account, was discharged solely on account of her candidacy, and not for any associated expressive speech, conduct, or associational activities. Moreover, as further discussed herein, federal courts in the Sixth, Seventh, and Eleventh Circuits have each addressed this precise issue in *Carver v. Dennis*, 104 F.3d 847 (6th Cir.1997); *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir.1977); and *Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010), respectively. *See also Deemer v. Durell*, 110 F.Supp.2d 1177 (S.D.Iowa 1999) (discussing cases that "have found that there is no *per se* right to candidacy.") The issue we address is far from original to this case, and the terminology is well established in this area of review.

tected. As discussed below, we find no reason to digress from that holding, and, from this determination, we additionally conclude that Cook has failed to establish that her discharge in retaliation for her candidacy resulted in a violation of any constitutionally protected right under the First Amendment.

### A. Kentucky Precedent Addressing a Right to Candidacy

Our prior examination of whether there is a constitutional right to candidacy is, principally, found in three cases: *Yonts v. Com. ex rel. Armstrong*, 700 S.W.2d 407 (Ky.1985); *Chapman v. Gorman*, 839 S.W.2d 232, 237–238 (Ky.1992), and *Crutchfield*.[9] Therefore, we begin our discussion with a brief review of these three important cases.

In *Yonts*, a board of education member (Yonts) declared his candidacy for the Kentucky House of Representatives, an office requiring the taking of the constitutional oath. Subsequently, the Attorney General brought a successful action to oust Yonts from his board seat pursuant to a "resign-to-run" statute which rendered ineligible any board of education member who became a candidate for nomination or election to a state office requiring the taking of the constitutional oath. On appeal to this Court, Yonts argued, *inter alia*, that the statute violated his First Amendment right to seek political

office. In rejecting this argument, we dismissively observed that Yonts's "Tree speech' argument evokes but little reaction in this [ ] court." *Id.* at 408.[10] While we did not expressly decide so at that time, by this choice of words, we obviously expressed a strong doubt that there is a First Amendment right to candidacy, and, moreover, foreshadowed our later holding in *Crutchfield*.

In *Chapman*, 839 S.W.2d 232, we considered a challenge to the constitutional validity of anti-nepotism provisions of a statute that, with certain exceptions, prohibited anyone from serving as a school board member who had a relative employed by the school district. We acknowledged in *Chapman* the noncontroversial principle that candidacy is not a fundamental right: "The alleged injury ... does not involve a fundamental right because no such status is given to candidacy." *Id.* at 237–238.[11] We left open, however, the question of whether some lesser, non-fundamental measure of constitutional protection was afforded to candidacy.

We answered that question in *Crutchfield*, another case involving the school board anti-nepotism statutes. In *Crutchfield*, as in *Chapman*, the Attorney General sought to oust from office a county board of education member under our anti-nepotism provisions. In again upholding

---

9. *See also Combs v. Huff*, 858 S.W.2d 160, 163 (Ky.1993) (there is no fundamental right to gain ballot access) and *Mobley v. Armstrong*, 978 S.W.2d 307 (Ky.1998) (two year residency requirement to run for district court judgeship does not violate equal protection.).

10. This wording was adopted from the decision of the circuit court.

11. Citing *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Yonts*, 700 S.W.2d 407; J. Nowak, R. Rotunda, and J.N. Young, Constitutional Law, Chap. 16,

§ VIII, p. 776, (2d ed.1983); and L. Tribe, American Constitutional Law, § 13–19 (2d ed.1988). The decision further noted that various federal circuit courts of appeal, under Equal Protection Clause analysis and First Amendment challenges have adhered to *Bullock* in holding that there is no fundamental right to candidacy (citing *Stiles v. Blunt*, 912 F.2d 260, 265 (8th Cir.1990); *Zielasko v. State of Ohio*, 873 F.2d 957 (6th Cir.1989); *Hatten v. Rains*, 854 F.2d 687, 693 (5th Cir.1988); and *Plante v. Gonzalez*, 575 F.2d 1119, 1126 (5th Cir.1978)).

the provisions, we stated, "[i]t [the anti-nepotism statute under review] does not inflict injury to Appellee's right to candidacy, *because no such constitutional status exists" Id.* at 624 (citing *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)) (emphasis added). It bears emphasis that, whereas in *Chapman* we held there is no *fundamental* constitutional right to candidacy, in *Crutchfield* we broadened our expression to state that there is no constitutional right to this status *at all.* This remains the clearly identifiable law in this jurisdiction.

 Since *Crutchfield* is otherwise dispositive, for Cook to prevail on her First Amendment claim, as a preliminary matter, it would be necessary for us to overrule *Crutchfield*'s holding that there is no constitutional right to candidacy.[12] And while we recognize that "the doctrine of *stare decisis* is less rigid in its application to constitutional precedents," *Harmelin v. Michigan,* 501 U.S. 957, 965, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), we must nevertheless bear in mind that its purpose is to "ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Chestnut v. Commonwealth,* 250 S.W.3d 288, 295 (Ky.2008) (quoting *Vasquez v. Hillery,* 474 U.S. 254, 265–265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)).

The concurring opinion of Justice Abramson chastises our giving credence to the plain meaning of *Crutchfield*'s holding that there is no constitutional right to candidacy, a holding she would treat as mere dicta. However, we have no reason to suppose that the *Crutchfield* Court did not give careful consideration to this issue, and, moreover, we should not go down the road of recasting clear holdings as dicta in order to avoid adverse authority. The concurrence further suggests that *Crutchfield* is flawed because it relied principally upon *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). However, *Bullock* was one of the three principal cases relied upon in *Newcomb v. Brennan,* 558 F.2d 825 (7th Cir.1977), which is the origin of both the Seventh Circuit's and the Sixth Circuit's line of cases holding that there is no constitutional right to candidacy. *Crutchfield* was far from the first case to recognize *Bullock* for the proposition that there is no constitutional right to candidacy.

As further discussed below, based upon applicable United States Supreme Court precedent, persuasive federal circuit court precedent, our independent reconsideration of whether the First Amendment protects a right to candidacy, and principles of *stare decisis,* we are unable to conclude that the constitutional interpretation we adopted in *Crutchfield* should be disturbed. *Stoll Oil Refining Co. v. State Tax Commission,* 221 Ky. 29, 296 S.W. 351 (1927) (the *stare decisis* doctrine is entitled to great weight, and is adhered to unless the principle established is clearly erroneous).

**B. United States Supreme Court Precedent Addressing a Right to Candidacy**

---

**12.** Cook cites us to the Court of Appeals decision in *Allen v. Board of Education of Jefferson County,* 584 S.W.2d 408 (Ky.App.1979), a case which considered two teachers who were forced to take a leave of absence pursuant to school policy because they were candidates for public office in the 1977 General Election. *Allen* held the school policy "inappropriate," explaining: "The appellants, by running for the legislature, were exercising their rights of free speech and association. These rights are protected by the First Amendment to the United States Constitution and may not be abridged without proof of compelling state interest." To the extent that *Allen* conflicts with our decision in this case, it is accordingly overruled.

The two United States Supreme Court decisions underpinning its jurisprudence on whether there is a constitutional right to candidacy are *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) and *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982).

*Bullock* concerned an action challenging the constitutional validity of the Texas primary election filing fee system, which required candidates for some offices to pay a filing fee to be listed on the party primary ballots. In striking down the filing fee statutes on Equal Protection grounds, the Supreme Court stated, "[t]he initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and *the Court has not heretofore attached such fundamental status to candidacy* as to invoke a rigorous standard of review." *Id.* at 142–143, 92 S.Ct. 849 (emphasis added). This wording, obviously, is ambiguous upon the question of whether there is or is not a lesser, non-fundamental right to candidacy.

A decade later, in *Clements*, the Court considered a case brought by four elected Texas officials and twenty Texas registered voters challenging the constitutionality of: (1) a provision of the Texas Constitution rendering an officeholder ineligible for the state legislature if his current term of office was not scheduled to expire until after the legislative term to which he aspired began, and (2) a "resign-to-run" or "automatic resignation" provision, under which a wide range of state and county officeholders with more than one year left on their term of office were deemed to have automatically resigned if they became a candidate for another office. In upholding the provisions, the Supreme Court, citing *Bullock*, stated: "*Far from* recognizing candidacy as a 'fundamental right,' we

have held that the existence of barriers to a candidate's access to the ballot "'does not of itself compel close scrutiny.'" *Clements*, 457 U.S. at 963, 102 S.Ct. 2836 (emphasis added).

In parsing the cited quotes from *Bullock* and *Clements*, other courts have reached opposite conclusions. Some courts have interpreted the Supreme Court's holding that there is no *fundamental* constitutional right to candidacy to mean that there is, nevertheless, some residual constitutional right; that is, a right of lesser significance than a "fundamental" right, but a right nonetheless. *See, e.g., Randall v. Scott*, 610 F.3d 701 (11th Cir.2010). Adherents of this view hold that the Court's ruling out of a "fundamental" First Amendment right to candidacy necessarily implies the existence of some other variant of a First Amendment right.

Other courts interpret the same language from *Bullock* and *Clements* to mean that not only is there not a fundamental right to candidacy, but, by inference, that there is no constitutional right at all. *See, e.g., Carver*, 104 F.3d at 852–53; *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir.1977); and *Crutchfield*, 157 S.W.3d 621. It appears that these courts have construed the Supreme Court's refusal to expressly acknowledge a *lesser* level of First Amendment protection as a signal that there is none. Also factored into this view is the notion that had there been such a right, the Court could have easily have said so.[13]

While only the United States Supreme Court can definitively parse the unclear wording, we find significance in that Court's use of the term, *"far from"* in the *Clements* quote, "Far from recognizing candidacy as a 'fundamental right' ...." 457 U.S. at 963, 102 S.Ct. 2836. The

13. For example the Court could have said: "While there is a constitutional right to candi-

dacy, that interest does not rise to the level of a fundamental right."

phrase "far from" (used as an adverb) has an idiomatic meaning defined as "of a distinctly different and especially opposite quality than."[14] Under this definition, arguably the "especially opposite quality" of a fundamental right is "no right at all" (rather than "some right").[15] Therefore, a sound—and perhaps the better—parsing of *Bullock* and *Clements* is that there is no constitutional right at all to candidacy. If this parsing is correct, then our holding in *Crutchfield* is, of course, accurate. Out of due consideration for the doctrine of *stare decisis,* therefore, we will lean toward this interpretation.

Before ending our discussion of the Supreme Court cases, it is interesting to note that in *United States Civil Service Commission v. National Association of Letter Carriers AFL–CIO,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), a Hatch Act case,[16] the Court discusses a historical event which may give some insight into the original intent of the Framers of the United States Constitution concerning whether there is a First Amendment right to candidacy. The *Letter Carriers* decision references events occurring not long after our founding under the presidency of Thomas Jefferson:

Early in our history [in 1801],[17] Thomas Jefferson was disturbed by the political activities of some of those in the Executive Branch of the Government. *See* 10 J. Richardson, Messages and Papers of the Presidents 98 (1899). The heads of the executive departments, in response to his directive, issued an order stating in part that '(t)he right of any officer to give his vote at elections as a qualified citizen is not meant to be restrained, nor, however given, shall it have any effect to his prejudice; but it is expected that he will not attempt to influence the votes of others *nor take any part in the business of electioneering, that being deemed inconsistent with the spirit of the Constitution and his duties to it.*'

*Id.* at 557, 93 S.Ct. 2880 (emphasis added). This anecdotal account of one of the principal Founder's condemnation of electioneering by "officers" of the executive branch (which would seemingly encompass running for office) as "inconsistent with the spirit of the Constitution and his duties to it," arguably hints that in the early years of the Republic, being a candidate for public office was not viewed as constitutionally protected under the First Amendment. If the "spirit of the Constitution" may pro-

14. http://www.merriam-webster.com/dictionary/far (select "adverb") (all internet cites last viewed December 12, 2011).

15. Merriam–Webster uses the example "the trip was far from a failure"—meaning the trip was a success—to illustrate the idiomatic usage of the phrase.

16. Generally, the Hatch Act (5 U.S.C.A. §§ 1501 to 1508, 7321 to 7326) prohibits certain government employees from engaging in certain political activities or from being partisan candidates for elected office.

17. *See McCormick v. Edwards,* 646 F.2d 173, 176–177 (5th Cir.1981), for a more detailed discussion of this event. This decision also notes that in 1907, President Theodore Roosevelt issued an executive order to the

effect that federal civil servants, "while retaining the right to vote as they please and to express privately their opinions on political subjects, *shall take no part in political management or political campaigns.*" Exec. Order No. 642 (June 3, 1907) (emphasis added). *See also McAuliffe v. City of New Bedford,* 155 Mass. 216, 29 N.E. 517 (1892), which upholds the discharge of a policeman who displeased the mayor by engaging in political activities. Justice Holmes, then of the Supreme Judicial Court of Massachusetts, held that the mayor could lawfully discharge the politically active policeman, famously stating "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman."

scribe public employees from candidacy, possibly the Founders did not intend to include a right to candidacy in the Amendment at all.[18]

Beyond *Bullock* and *Clements* we find little direction concerning the Supreme Court's view on this precise issue.[19] Clearly, *Bullock* and *Clements* are not at odds with our conclusion in *Crutchfield*. We simply find no reason to infer from the Supreme Court's determination that the First Amendment embodies no *fundamental right* to candidacy, that there is, nevertheless, *some lesser* form of a constitutional right to candidacy found in the First Amendment. Thus, our *Crutchfield* decision and the decision we reach today may

be comfortably reconciled with the two principal Supreme Court pronouncements on the issue.

### C. U.S. Federal Circuit Precedent

We next examine select federal circuit court decisions relevant to our holding today. As discussed below, the Sixth Circuit and Seventh Circuit Court of Appeals have taken the initiative among the federal courts in concluding that there is no per se First Amendment right to mere candidacy, though, as noted in Justice Abramson's concurrence, other jurisdictions hold otherwise.[20]

The Seventh Circuit cases holding that there is no federal constitutional right to candidacy include *Newcomb, Bart v. Tel-*

---

18. Or, alternatively, if they intended a First Amendment right for the general public, did not intend that the right to extend to public employees (the situation we address). Though this would not agree with the modern cases under which public employees are not be seen as forfeiting their constitutional rights altogether, but rather, that constitutional rights survive their governmental employment, but are, where applicable, subordinated to significant governmental interests.

19. *Cf.*, for example, *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (upholding Oklahoma statute which provided that certain public officials shall not be a member of any national, state or local committee of a political party, or an officer or member of a committee of a partisan political club, or a candidate for nomination or election to any paid public office upheld because the statute regulated political activity in an even-handed and neutral manner); *National Association of Letter Carriers, AFL–CIO*, 413 U.S. 548, 93 S.Ct. 2880 (upholding federal Hatch Act prohibition against federal employees taking an active part in political management or in political campaigns on the basis that neither First Amendment nor any other provision of Constitution invalidated Congress's barring such partisan political conduct by federal employees); *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (Congress may regulate the political conduct of government employees

within reasonable limits, though the regulation trenches to some extent upon unfettered political action, the extent of regulation lying primarily with Congress, and courts will interfere only when such interference passes beyond the general existing conception of governmental power, as developed from practice, history, and changing educational, social and economic conditions.); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (Ohio election laws making it virtually impossible for new political party, even though it has hundreds of thousands of members, or an old party, which has very small number of members, to be placed on state ballots to choose electors pledged to particular candidates for Presidency and Vice–Presidency of United States resulted in denial of equal protection of the laws); and *Buckley v. Valeo*, 424 U.S. 1, 39–59, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (holding, *inter alia*, that provisions limiting expenditures by candidates on their own behalf violated the candidates' rights to freedom of speech).

20. Justice Abramson's concurrence comprehensively discusses cases from other federal circuits addressing whether there is a constitutional right to candidacy, and so we do not duplicate her effort in our discussion. *See also*, 44 A.L.R. Fed. 306, *Prohibiting Public Employee From Running for Elective Office as Violation of Employee's Federal Constitutional Rights*.

*ford,* 677 F.2d 622 (7th Cir.1982), and *Wilbur v. Mahan,* 3 F.3d 214 (7th Cir.1993). In *Newcomb,* a discharged deputy city attorney alleged that his constitutional rights were violated by his dismissal from his position when, against the wishes of the city attorney, he announced his intention to run for Congress. In upholding the discharge, the court cited to *Buckley v. Valeo,* 424 U.S. 1, 39–59, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); *Bullock,* 405 U.S. 134, 92 S.Ct. 849; and *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), and concluded that, "[t]hese decisions indicate that plaintiff's interest in seeking office, by itself, is not entitled to constitutional protection." 558 F.2d at 828.[21] In *Bart,* a city employee brought a complaint against the mayor and three of his subordinates after she was required to take a leave of absence while campaigning for mayor. In upholding the district court's dismissal of this aspect of the complaint,[22] Judge Posner stated as follows:

> So far as the first allegation is concerned, that by forcing her to take a leave of absence the mayor infringed her First Amendment rights, the only right specifically alleged is the right to run for public office. *The First Amendment does not in terms confer a right to run for public office, and this court has held that it does not do so by implication either. Newcomb v. Brennan,* 558 F.2d 825, 828 (7th Cir.1977). It is true that political campaigns are important vehicles for the expression of ideas and opinions on public issues, notably by the candidates themselves, and therefore that restrictions on eligibility for public office could impair free speech. Nevertheless, this court held in *Newcomb* that a restriction on candidacy could not be presumed to have this effect; something more than the restriction had to be shown to bring the First Amendment into play.

*Id.* at 624 (emphasis added).

In *Wilbur,* a deputy sheriff brought a § 1983 action against the sheriff, claiming violation of his First Amendment rights. While the majority principally analyzed the case under the *Elrod–Branti* test,[23] in his concurrence, Judge Easterbrook, citing *Clements,* 457 U.S. 957, 102 S.Ct. 2836; *Broadrick,* 413 U.S. 601, 93 S.Ct. 2908; *National Association of Letter Carriers AFL–CIO,* 413 U.S. 548, 93 S.Ct. 2880, and *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), stated: "My colleagues treat a simple case governed by settled doctrine as if it were complex and novel. Much could be said for their discussion as an original matter, but it is not an original matter. The Supreme Court has held that, without violating the First Amendment, a public body may forbid its employees to run for elective office." *Wilbur,* 3 F.3d at 219.

The key Sixth Circuit case finding no First Amendment right to candidacy is *Carver,* 104 F.3d 847,[24] a case factually

---

**21.** Noting that the deputy city attorney's complaint implicated interests which are broader than a per se right to candidacy (i.e. that the firing represented punishment by the state based on the content of a communicative act) the court concluded "that under the circumstances of this case, plaintiff's interest in seeking office was protected by the First Amendment."

**22.** The court held that plaintiff's complaint that she was harassed after returning to work

from her unsuccessful campaign was cognizable.

**23.** See *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

**24.** The circuit court applied *Carver* as though it was bound by the decision as controlling precedent. That, however, is not a correct application of Sixth Circuit precedent. *Natu-*

indistinguishable from the case *sub judice*, and also the decision principally relied upon by the circuit court and the Court of Appeals in ruling against Cook. Narrowly stating the issue as "whether Carver, a deputy county clerk who was an at-will employee in a two-person office—the other person being the county clerk herself—had a First Amendment right to run against the incumbent clerk in the next election and still retain her job," *id.* at 849, the Sixth Circuit affirmed the dismissal because it was not based upon Carver's political beliefs or affiliations, but rather was related solely to Carver's running for the county clerk position. Citing to *Bart*, 677 F.2d at 624, the court concluded that "Carver's termination is neutral in terms of the First Amendment." *Carver*, 104 F.3d at 852. After further discussion of authorities cited by the parties, the court held as follows:

> In sum, we hold that no reading of the First Amendment required Dennis to retain Carver after Carver announced her intention to run against Dennis for Dennis's office. To hold otherwise, on the facts of this case, would be to read out of the entire line of relevant Supreme Court precedent the factual requirements of political belief, expression and affiliation, partisan political activity, or expression of opinion, and to read into that precedent a fundamental right to candidacy. The First Amendment does not require that an official in Dennis's situation nourish the viper in the nest. Dennis's discharge of Carver did

not implicate Carver's First Amendment rights.

*Id.* at 853. *Carver* has since been followed in, *Greenwell v. Parsley*, 541 F.3d 401, 404 (6th Cir.2008), *cert. denied* 558 U.S. 817, 130 S.Ct. 64, 175 L.Ed.2d 25 (2009) (sheriff's firing of deputy after learning deputy planned to run against him in election did not violate deputy's First Amendment rights) and *Myers v. Dean*, 216 Fed.Appx. 552, 554 (6th Cir.2007) (county clerk's firing of deputy clerk after she ran against him in election did not violate First Amendment); *Cf. Murphy v. Cockrell*, 505 F.3d 446 (6th Cir.2007) (distinguishing *Carver* where termination by the PVA of a Deputy PVA following a rival candidacy was based upon the "employee's political expressions during her own candidacy.").

In her concurrence, Justice Abramson comprehensively surveys other federal circuit court precedent addressing a public employee's candidacy rights, and so we do not duplicate that effort in our discussion. However, for the purpose of illustrating the opposing view, we will single out the recent Eleventh Circuit case, *Randall v. Scott*, 610 F.3d 701 (11th Cir.2010), which advises that "[p]recedent in the area of constitutional protection for candidacy [is] best described as a legal morass,"[25] an observation with which we agree. In *Randall*, Scott was elected a district attorney, and named Randall as her chief of staff. After his appointment, Randall decided to run for Chairman of the county board of commissioners. Serious dissention developed between Scott and Randall when Scott's husband decided also to pur-

---

*ral Resources and Environmental Protection Cabinet v. Kentec Coal Co.*, 177 S.W.3d 718, 725 (Ky.2005) ("Decisions of the lower federal courts are not conclusive as to state courts[.]")

**25.** Citing *Cutcliffe v. Cochran*, 117 F.3d 1353, 1360 (11th Cir.1997) (Harris, Senior U.S. Dis-

trict Judge sitting by designation and specially concurring) ("Is there confusion in this area of law? Members of the Supreme Court are among those who have expressed their belief that there is, and my study of the subject matter leads me to the same conclusion.").

sue the office. Randall nevertheless persisted in running, and under pressure from her husband, Scott fired Randall. In addressing Randall's § 1983 claim against Scott, the Eleventh Circuit concluded "[e]ven though *Clements* does not make clear the degree of constitutional scrutiny required for candidacy restrictions, the Court does suggest that political candidacy is entitled to at least a modicum of constitutional protection," 610 F.3d at 712, and that "[a]n interest in candidacy, and expression of political views without interference from state officials who wish to discourage that interest and expression, lies at the core of values protected by the First Amendment." *Id.* at 713.[26]

Upon our review of these competing positions, and for the reasons further discussed below, we decline to follow the Eleventh Circuit's reasoning in *Randall*,[27] and will instead endorse the view favored by the Sixth and Seventh Circuits, and previously endorsed by this Court in *Crutchfield.*

### D. Additional Considerations

Our continued approval of *Crutchfield* and our corresponding rejection of *Randall* and similar cases is strengthened by the observation that the courts adhering to the *Randall* view have failed to explain, by example or otherwise, exactly what is the "modicum" of First Amendment interests that rests within the act of seeking elective office. They seem unable or unwilling to explain exactly what "some level" of "qualified" First Amendment

rights is. A constitutional right is not an amorphous, vaporous thing, the presence of which may be sensed, but cannot be articulated or defined. We suggest that what is sensed in these decisions is not a First Amendment right or interest in being a candidate, but simply the fact that candidacy ordinarily becomes a complex activity in which candidates, like any citizen, may engage in actions that are explicitly protected by the First Amendment. Candidates speak and they publish. They assemble with others, they practice their religion, and they might even petition the government for redress of grievances. No one suggests that in becoming a candidate, such activities lose First Amendment protection. But the essential act of becoming a candidate and the condition of being a candidate for elective office are, in the final analysis, no more of an exercise of First Amendment liberty than applying for a job.

Stated differently, standing alone, candidacy is not expressive speech or conduct, nor does it alone implicate acts of association or assembly. Stripped of its accompaniment of expressive messages and assemblages of supporters (which is the situation we consider), candidacy alone communicates nothing of substance. Of course, while the status of candidacy itself enjoys no First Amendment protection, the candidate's activities and associations, the organizing of supporters, and speaking and publishing on matters of public interest, receive the highest degree of First Amendment protections. *Elrod v. Burns,*

---

26. The defendants did not seek certiorari on this holding.

27. We note that *Randall* has received scholarly criticism for its interpretation of *Bullock* and *Clements. See* Kevin C. Quigley, Comment, *Wading Through the "Morass": The Eleventh Circuit Recognizes a Right to Candidacy in Randall v. Scott,* 52 B.C. L.Rev. E. Supp. 185 (2011), http://www.bc.edu/bclr/

esupp_2011/15_quigley.pdf., which concludes that "the Eleventh Circuit's novel approach, although well intentioned, is only tenuously grounded in Supreme Court precedent[,]" *id.* at 185, and "[n]either [*Bullock* nor *Clements* ] supports the proposition that candidacy enjoys per se constitutional protection." *Id.* at 189.

427 U.S. 347, 356, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). ("Political belief and association constitute the core of those activities protected by the First Amendment."); *Buckley*, 424 U.S. 1, 15, 96 S.Ct. 612 ("The First Amendment protects political association as well as political expression.").[28]

Few, if any, legitimate acts are so highly regulated by state law as becoming a candidate for public office. Every state has constitutional and statutory qualifications for public office that were purposefully designed to limit or restrain the ability of persons to run for public office. Laws commonly, if not universally, impose upon candidacy geographic or residential restrictions, age and citizenship restrictions, and sometimes educational or experiential restrictions. Such laws effectively control the eligibility for elective office without any abridgment of First Amendment liberty because running for elective office is simply not among the rights secured by the First Amendment.

■ That candidacy has always been heavily burdened by state regulation in no way suggests that the state has unfettered power to obstruct an individual's desire to seek elective office. But, in our view, the protection afforded by the United States Constitution to persons who desire to run for office is not derived from the First Amendment; rather, as illustrated by *Bullock* and *Clements*, it is found in the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause requires that state policies, including statutes and the employment policies of governmental agencies, that differentiate between those who may become a candidate for elective office and those who may not must bear a rational relationship to a legitimate state purpose. *Mobley v. Armstrong*, 978 S.W.2d 307, 309 (Ky.1998). Notably for our review, Cook does not assert that her firing violated Equal Protection principles.

### E. Conclusion

In summary, we hold that the First Amendment affords no constitutional protection to candidacy for political office *per se*. Upon this determination, it necessarily follows that Cook has failed to state a claim under 42 USC § 1983. Accordingly, we conclude that the circuit court was correct in awarding summary judgment to Popplewell and Russell County, and dismissing Cook's lawsuit.

## V. COOK HAS FAILED TO ALLEGE THE REQUISITE GROUNDS OF AN OFFICIAL CAPACITY SUIT

■ While the constitutional issue presented by this case is significant and

---

**28.** Justice Abramson asserts that candidacy is "seemingly one of the most basic forms of speech a democratic society fosters," and that Cook's candidacy is speech on a matter of public importance because it carries the "nascent message" that she would be a better county clerk than Popplewell. It is not candidacy itself however, that constitutes the "message." There are enumerable reasons why one may choose to be a candidate. Some candidates seek only the prestige, power, and trappings of the office, with little concern for who is the better public servant. Others, with no real expectation of winning the office, run to garner attention to promote themselves in other undertakings, such as to attract clients for their law practice. Candidacy may be the mechanism that bears their messages, but it is not the message. Words written on a sheet of paper may be expressive communication, but the blank paper itself is not. For an interesting discussion of the point, in a different context, *see Nevada Com'n on Ethics v. Carrigan*, — U.S. ——, 131 S.Ct. 2343, 180 L.Ed.2d 150 (2011) (Explaining why a legislative vote is not expressive conduct); *Cf. Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (expressive value was "not created by the conduct itself but by the speech that accompanies it").

dispositive, there is a further reason for affirming the trial court's summary judgment. As noted above, a § 1983 claimant must establish both that she has been deprived of a federal right and that the defendant is responsible for the deprivation. Under the statute, government bodies are not subject to vicarious liability for the torts of their agents. *Monell v. N.Y. City Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478–79, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). For tortious conduct to provide a basis for a government body's § 1983 liability, the tort—the deprivation of the plaintiff's right—must have been committed pursuant to the government body's official policy. *Id.* This does not mean that the government body can never be found liable for a single decision meant to apply only to immediate circumstances. *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292 ("liability may be imposed [under § 1983] for a single decision"). Nor does it mean that every decision by an officer of the government automatically subjects the government to liability. Rather:

> [m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. . . . The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Id.* at 481–83, 106 S.Ct. 1292 (citation and footnotes omitted). A suit against a person in his or her official capacity is a suit against the office and not the person. To maintain her suit against Russell County, Cook had to show that Popplewell had final authority to establish official county policy with respect to the hiring of her deputy clerks. This Cook has failed to do.

In her reply brief, Cook asserts that because Popplewell was acting "within her purview" as County Clerk when she discharged Cook, she was acting as county policymaker. But, as the United States Supreme Court has stated, the mere fact that the official has discretion in the exercise of particular functions does not by itself subject the County to liability. *Id.* at 481–82, 106 S.Ct. 1292. The official must have policymaking authority as well. *Id.* As the source of that authority, Cook refers us to KRS 64.530, which provides for the compensation of county officers, employees, deputies and assistants, and members of the fiscal court. Subsection (3) of the statute provides that the fiscal court shall fix the maximum amount officers may expend for deputies and assistants, but that the officer may determine the number of deputies and assistants to be hired and the individual compensation of each. While this statute is a source of the discretion Popplewell exercised when she discharged Cook, it says nothing about the County Clerk's authority to establish county hiring policies, such as a policy prohibiting deputy clerks from running for elective office. If anything, it suggests that that authority remains in the fiscal court along with its ultimate authority over the size of the County Clerk's budget. Indeed, Cook's complaint cites the Russell County Administrative Code as the source of County employment policies. Be that as it may, it remains that Cook has only shown that Popplewell had discretion to hire and fire her deputies, which is not enough to establish official capacity or county liability. *See also Caudill*, 431 F.3d at 900 (Sixth Circuit held that the plaintiffs' failure to offer evidence that the Boyd County Clerk had the authority to establish county

hiring policy supported summary judgment in favor of Clerk sued in her official capacity).[29] For this reason, too, we are convinced that the trial court's summary judgment was appropriate.

## VI. COOK'S FOURTEENTH AMENDMENT CLAIM DOES NOT PERMIT REVIEW

Finally, Cook asserts that if the First Amendment does not protect her interest in being a candidate, then the Due Process Clause of the Fourteenth Amendment does. We decline to address this issue, as Cook has devoted a mere two paragraphs of her brief to this very large question and has referred us only to a single federal District Court opinion in support of her Due Process Clause assertion. It is not clear from Cook's brief whether she is asserting a substantive or a procedural right, but if procedural she has not indicated what process was due. Civil Rule 76.12(4)(c)(v) requires the parties' opening briefs to include "*ample* supportive references to the record and citations of authority pertinent to each issue of law." (emphasis supplied). Cook's cursory Fourteenth Amendment Due Process Clause argument does not comply with the rule, and for that reason, we decline to address it. *Cf. Doherty v. City of Chicago*, 75 F.3d 318, 324 (1996) (discussing the requirements of the comparable federal appellate rule).

## VII. CONCLUSION

For the reasons explained, we affirm the judgment of the Russell Circuit Court awarding summary judgment in favor of Popplewell and Russell County.'

CUNNINGHAM, SCHRODER, and SCOTT, JJ., concur. ABRAMSON, J., concurs in result only by separate opinion in which MINTON, C.J., and NOBLE, J., join.

ABRAMSON, Justice, concurs in result only:

I concur with the majority's discussion of many of the issues raised by this appeal, and I concur in its ultimate conclusion that Appellant Stacie Cook is not entitled to relief under 42 U.S.C. § 1983. I write separately because I cannot agree that candidacy, running for office, seemingly one of the most basic forms of speech a democratic society fosters, enjoys no protection under the First Amendment. That nevertheless is the distinctly minority view the Court today adopts. Because deciding that constitutional question is not necessary to our decision, and because I strongly disagree with the majority's reading of the First Amendment, I respectfully decline to join the majority opinion and concur in result only.

### RELEVANT FACTS

As noted, Appellant Cook, a deputy clerk in the Russell County Clerk's office, sought election to the office of County Clerk in opposition to her boss, the incumbent County Clerk, Lisha Popplewell. Although there is some dispute about precisely what occurred between the two women, there is no dispute that shortly

---

**29.** In *Caudill,* the newly elected Boyd County Clerk fired three deputy clerks who had supported her opponent in the election. The Sixth Circuit held that "patronage dismissals of Kentucky deputy county clerks with routine duties violates (sic) the U.S. Constitution." 431 F.3d at 910. However, the County Clerk could not be held liable in her official capacity because there was no evidence she had final policymaking power with respect to the hiring/rehiring of deputy clerks "for political or patronage reasons." *Id.* at 915. The Court did remand the claims against the County Clerk in her individual capacity to the trial court because she was not entitled to qualified immunity given the clearly established law prohibiting patronage dismissal of clerical-type workers.

after Cook began making known her fledgling candidacy by informing co-workers of her decision and soliciting support from her customers, Popplewell discharged her. Eventually Cook brought suit in the Russell Circuit Court under 42 U.S.C. § 1983. She alleged that Popplewell in her official capacity as County Clerk and Russell County violated her rights under the First Amendment to the United States Constitution when they retaliated against her for seeking office. Granting the defendants' motion for summary judgment, the trial court ruled, among other things, that Cook's candidacy did not implicate the First Amendment and so could not provide the basis for § 1983 relief. When the Court of Appeals upheld that ruling, relying heavily on the Sixth Circuit Court of Appeals' opinion in *Carver v. Dennis*, 104 F.3d 847 (6th Cir.1997), Cook sought and was granted discretionary review in this Court.

### ANALYSIS

### I. Because There Are Other Grounds for Disposition of the Case, the Issue of the Constitutional Protection Accorded Candidacy Need Not Be Decided.

Although we accepted review of this case in large part because of the constitutional question it posed, and although that is the question upon which both the parties and the courts below focused their attention, it is a "long-observed principle that Constitutional adjudication should be avoided unless strictly necessary for a decision in the case." *Spees v. Kentucky Legal Aid*, 274 S.W.3d 447, 449 (Ky.2009) (citation and internal quotation marks omitted); *Camreta v. Greene*, — U.S. ——, 131 S.Ct. 2020, 2031, 179 L.Ed.2d 1118 (2011) (there is a "longstanding principle of judicial restraint ... that courts avoid reaching constitutional questions in advance of the necessity of deciding them." ') (quoting from *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)). While the constitutional protection to be accorded candidacy is appropriately addressed, there is no need to decide this important constitutional question in the case before us, because there are non-constitutional grounds and less far reaching grounds precluding the relief Cook seeks, regardless of whether candidacy is or is not constitutionally protected.

In the first place, as the majority observes, Cook pursued an official capacity theory of § 1983 liability, but she failed to allege facts which would permit a finding that she was discharged pursuant to official policy, a necessary element in an "official capacity" cause of action. The trial court offered this as an alternative reason for granting the defendants' summary judgment motion and we could properly affirm its ruling on that ground alone.

In the second place, even if Cook's candidacy enjoyed a measure of constitutional protection, as I believe it does, that protection does not extend to campaign activities disruptive of the workplace. By Cook's own admission she campaigned while at work and during her County work time. Indeed, in a small public office such as the Russell County Clerk's office, it may well have been impossible for Cook not to inject her candidacy into the workplace. Regardless, the fact that she did justified her discharge. The discharge was not, therefore, a violation of her constitutional rights, however construed, and so deciding this particular case does not require a definitive decision on the constitutional issue the Court takes up.

### II. Candidacy Enjoys Qualified First Amendment Protection.

Because Cook is not entitled to 42 U.S.C. § 1983 relief for the reasons I have

briefly summarized, I concur in the Court's decision to the extent that it reaches that result. I do not concur in the majority's constitutional analysis, however, and so turn now to the difficult question of candidacy's status under the First Amendment. I agree with those several courts which have recognized candidacy's First Amendment implications, but have held that the right of state employees to be candidates is subject to reasonable restriction in light of the State's compelling interest in the efficient and non-partisan provision of governmental services.

Under what has come to be referred to as *Pickering [v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ]/*Branti [v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) ] analysis,[30] to prevail on a retaliation claim stemming from the exercise of First Amendment rights,

> an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination. If the employee discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.... And even termi-

nation because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong.

*Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996).

Where the conduct at issue can be deemed speech for First Amendment purposes, the United States Supreme Court has explained that the employee must show that he or she spoke as a citizen on a matter of public concern, as opposed to speech addressing merely personal matters—such as intra-office grievances—or speech owing its existence to the employee's professional responsibilities. *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). As the quote from *Umbehr* indicates, moreover, even speech on matters of public concern may be restricted, if it impairs the government employer's efficient operation. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Recognizing the enormous variety of circumstances in which these issues may arise, the Court has cautioned that each case requires a particularized balancing of

---

**30.** *Pickering* involved a school teacher who was dismissed after he expressed his opinion on school funding issues in a letter to the newspaper. Justice Marshall noted that "the problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. 1731.

In *Branti*, the Court stated "[i]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." 445 U.S. at 517, 100 S.Ct. 1287. The

*Branti* Court concluded it would "undermine, rather than promote, the effective performance of an assistant public defender's office to make his tenure dependent on his allegiance to the dominant political party." *Id.* at 519–20, 100 S.Ct. 1287. In so ruling, the Court noted that "the primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State." *Id.* The Court further observed: "This is in contrast to the broader public responsibilities of an official such as a prosecutor. We express no opinion as to whether the deputy of such an official could be dismissed on grounds of political party affiliation or loyalty." 445 U.S. at 519 n. 13, 100 S.Ct. 1287 (citation omitted).

the competing interests and that the government employer's burden in justifying a particular discharge will vary "depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. 1684.

Where the conduct at issue implicates the employee's interest in association and belief, the Court has held that, generally, adverse employment actions for supporting or for failing to support a particular political party are unconstitutional. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).[31] The same rule applies to adverse employment decisions based upon support of and loyalty to a particular candidate as distinguished from a political party. *Jordan v. Ector County*, 516 F.3d 290 (5th Cir.2008). The Supreme Court has recognized an exception to the general rule, however, when "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. 1287 (recognizing party affiliation could be relevant to policymaking and "confidential" positions such as aides to a governor who assist in writing speeches, communicating with the press or conferencing with the legislative branch).

Many cases, of course, do not fall neatly into one category or the other, but present instances of expression intermixed with elements of association or belief. Such cases, the Supreme Court has indicated, may be accommodated by the same sort of "reasonableness analysis" implicit in the approaches mandated by *Pickering* and *Branti*. *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 719, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996). *See, e.g., Rodriguez Rodriguez v. Munoz Munoz*, 808 F.2d 138 (1st Cir.1986) (discussing the analysis of hybrid First Amendment cases); *McBee v. Jim Hogg County, Texas*, 730 F.2d 1009 (5th Cir.1984). (same).

Cook maintains that her expressed intention of seeking election to the office of Russell County Clerk—her candidacy—implicates both her right to speak on matters of public concern as well as her right to associate with her political supporters and that her discharge violated those First Amendment rights. Courts have approached such contentions warily, for, as the Court of Appeals for the Eleventh Circuit recently observed, "[p]recedent in the area of constitutional protection for candidacy can be best described as a legal morass." *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir.2010). Much of the problem stems from the fact that the United States Supreme Court has never addressed candidacy in the context of an employment action, such as this one, where an employee's candidacy is alleged to have provoked employer retaliation. Absent that direct precedent, the lower courts have sought to apply cases from other contexts, most of them involving legislative or state constitutional restrictions on candidacy, and most of them addressing equal protection challenges. In that context, the U.S. Supreme Court has emphasized the interrelatedness of candidates' rights and voters' rights and has focused its concern on "the tendency of ballot access restrictions 'to limit the field of candidates from which voters might choose.' Therefore, '[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.'" *Anderson v. Celebrezze*, 460 U.S. 780, 786, 103 S.Ct. 1564, 75 L.Ed.2d 547

---

**31.** A dismissal on these grounds is often referred to as a "patronage dismissal."

(1983) (quoting from *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)). Using that approach, the Court has struck down restrictions with a tendency to exclude candidates who are independent of any political party or who represent a minority party. *Anderson; Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *Bullock v. Carter; Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Although focused on the rights of voters, these cases would seem to recognize, implicitly at least, a candidate's own correlative rights of expression and association. *See, e.g., Illinois Elections Bd.*, 440 U.S. at 186, 99 S.Ct. 983 ("an election campaign is a means of disseminating ideas as well as attaining political office."); *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564 ("a candidate serves as a rallying-point for like-minded citizens.").

On the other hand, the Supreme Court has recognized the strong interest that States have in assuring the orderliness, integrity, and reliability of the electoral process and in disqualifying individuals whose candidacy would frustrate "legitimate state goals which are unrelated to First Amendment values." *Anderson*, 460 U.S. at 788, n. 9, 103 S.Ct. 1564. It has upheld, accordingly, generally-applicable and evenhanded restrictions on candidacy reasonably furthering those interests. *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982); *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

Notably, in *Clements*, which upheld Texas constitutional provisions limiting the right of certain state and federal office holders to seek election to the Texas legislature during their current terms, the right to candidacy was distinguished from the right to vote, and, for equal protection purposes, was deemed to be of less constitutional import: "Far from recognizing candidacy as a 'fundamental right,'" the Court observed,

> we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.' ... Decision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions.

*Clements*, 457 U.S. at 963, 102 S.Ct. 2836 (quoting from *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)). While, as discussed more fully *infra*, a few courts have seized on the language rejecting the proposition that candidacy is a "fundamental right" to conclude that candidacy is entitled to no First Amendment protection whatsoever, *Clements* itself suggests the contrary. Having decided the case on equal protection grounds, the Court briefly addressed the alternative First Amendment argument by noting, "We have concluded that the burden on *appellees' First Amendment interests in candidacy* are so insignificant that the classifications [of the Texas constitutional provisions] may be upheld consistent with traditional equal protection principles. The State's interests in this regard are sufficient to warrant the *de minimis* interference with appellees' interests in candidacy." *Id.* at 971–72, 102 S.Ct. 2836 [32]

---

**32.** The majority disregards this portion of the Supreme Court's opinion and its apparent recognition of "First Amendment interests in candidacy," and instead purports to find the Court's intent to deny candidacy First Amendment protection from the sentence, "Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of

(emphasis supplied). *See also Randall v. Scott*, 610 F.3d at 712 ("Even though *Clements* does not make clear the degree of constitutional scrutiny required for candidacy restrictions, the Court does suggest that political candidacy is entitled to at least a modicum of constitutional protection.")

Attempting to apply these non-employment cases to the employment arena, where the State is acting not as sovereign with an interest in regulating the election process, but as employer with an interest in the efficient provision of governmental services, several courts have recognized that while candidacy may not be a fundamental right eliciting the sort of exacting judicial scrutiny accorded the right to vote, it is, nevertheless, an important right with First Amendment implications. Accordingly, in most cases involving claims of retaliatory discharge because of the employee's candidacy, the courts have engaged in some sort of *Pickering/Branti* balancing to assess whether the discharge was justified notwithstanding its encroach-

ment upon the employee's First Amendment right. *See, e.g., Randall v. Scott*, 610 F.3d at 710–11 (candidacy enjoys at least some First Amendment protection; district attorney's reason for dismissing candidate-employee (running against her husband for county commissioner) was purely personal reason that did not survive *Branti* balancing) [33]; *Jordan v. Ector County*, 516 F.3d at 297–98 (deputy clerk's candidacy involves both speech on matter of public concern and political affiliation and caused no work disruption; jury damage award affirmed); *Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir.1999) (deputy sheriff's candidacy against his boss was a manner of political speech on matter of public concern but his candidacy interest did not outweigh state's interest in effective law enforcement); *Wilbur v. Mahan*, 3 F.3d 214, 215–16 (7th Cir.1993) (deputy sheriff's candidacy against his boss is a form of political speech but dismissal justified because deputy occupies a policymaking position as described in *Branti*); *Finkelstein*

barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.'" 457 U.S. at 963, 102 S.Ct. 2836. Since "no right" is about as far from "fundamental right" as you can get, reasons the majority, Justice Rehnquist's use of the phrase "far from" should be understood as implying that candidacy enjoys no First Amendment protection. Aside from the fact that the precedent to which Justice Rehnquist refers says no such thing and so belies the majority's inference, the real contrast being made is that between strict scrutiny, on the one hand, the level of review applied to legislation burdening fundamental rights, and, on the other hand, a less exacting, more deferential level of review applied to legislation that does not burden fundamental rights. In rejecting the appellants' invocation of strict scrutiny, Justice Rehnquist does indeed point to strict scrutiny's "far from" opposite—a sort of rational basis review—as all that, under the facts presented, precedent required. The Supreme Court's application of a less exacting level review does not mean, however, that the

appellant-candidates had no rights, but rather that burdens on those rights would be upheld if they could be deemed reasonably to further legitimate state interests.

Even less convincing is the majority's foray into constitutional history. Suffice it to say that nowhere in *United States Civil Service Commission v. National Association of Letter Carriers AFL–CIO*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), is there any suggestion that candidacy is on a different constitutional footing from any of the other partisan political activities, such as fund raising and campaigning on behalf of others, clearly protected by the First Amendment but nevertheless subject to the Hatch Act's restrictions.

**33.** Significantly the Eleventh Circuit stated: "We agree that if Randall decided to run against Scott [his boss] for Clayton County District Attorney, Scott would have good legal reason to discharge him due to the state's interest in office loyalty." 610 F.3d at 714.

*v. Bergna,* 924 F.2d 1449, 1453 (9th Cir. 1991) (unsuccessful candidacy of deputy district attorney is a protected communicative act but district attorney had qualified immunity justifying summary judgment in his favor).

The balancing approach employed in these cases is in accord with the balancing of interests the Supreme Court applied in the ballot access cases discussed above. It is also in accord with *United States Civil Service Commission v. National Association of Letter Carriers AFL–CIO,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) and *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), in which the Supreme Court upheld the Hatch Act and its state law counterparts. With the Hatch Act, Congress prohibited partisan political activity by virtually all federal employees. In *Letter Carriers,* the Court discussed the government's different roles as sovereign and as employer and applied *Pickering* as the appropriate means in the employment context for determining whether the government's interest in developing a non-partisan, merit-based work force justified the Hatch Act's far-reaching restrictions on employee First Amendment activity. 413 U.S. at 564, 93 S.Ct. 2880.

As noted, the trial court in this case did not engage in any sort of *Pickering/Branti* balancing of interests, but instead, relying on *Carver v. Dennis,* 104 F.3d at 847, ruled that Cook's candidacy enjoyed no constitutional protection whatsoever and so could not provide the basis for § 1983 relief. In *Carver,* the Sixth Circuit upheld the dismissal of a deputy clerk who had declared her candidacy for County Clerk in opposition to her boss. The two women were the only employees in the County Clerk's office and apparently worked at close quarters. Quoting the language from *Clements v. Fashing,* 457 U.S. at 963, 102 S.Ct. 2836, referred to above, that candidacy is not a "fundamental right," the Sixth Circuit opined that restrictions on candidacy unrelated to the candidate's political views do not implicate the First Amendment. It was within the County Clerk's prerogative, that federal appellate Court believed, to adopt an office policy forbidding all employees (*i.e.,* the lone deputy clerk) to run for Clerk, and the deputy clerk's dismissal could be deemed to imply the application of just such a policy. Because in the Court's view the deputy clerk's dismissal stemmed not from any message her candidacy might convey, but solely from the implicit ban on candidacy itself, the Court held there was no protected interest on which to premise a § 1983 claim. On the facts of the case, moreover,[34] the Court believed that the deputy clerk's opposition could be deemed insubordinate, and the County Clerk was under no First Amendment obligation to "nourish the viper in the nest." 104 F.3d at 853.

Although the Sixth Circuit continues to follow *Carver, see Greenwell v. Parsley,* 541 F.3d 401 (6th Cir.2008), it appears that the Seventh Circuit is the only other Circuit to have expressed the view that candidacy as such enjoys no First Amendment protection. *Newcomb v. Brennan,* 558 F.2d 825, 828 (7th Cir.1977) ("plaintiffs interest in seeking office, by itself, is not entitled to constitutional protection.")[35] Several oth-

---

**34.** The *Carver* opinion emphasizes repeatedly that *Carver* was the "sole employee" and she was trying to take her boss's job.

**35.** As the Court of Appeals noted in this case, several Courts, this one included, have applied rational basis review to legislative ballot restrictions on the ground that candidacy is not a fundamental right entailing strict scrutiny. *See, e.g., Commonwealth ex rel. Stumbo v. Crutchfield,* 157 S.W.3d 621 (Ky.2005). The absence of a fundamental right, however, does not mean that there is no right at all.

ers, as noted above, have held that dismissals of state employees who have announced candidacy for office, like other alleged First Amendment retaliations, are appropriately analyzed under *Pickering* and *Branti*. We, of course, look to the Sixth Circuit with a great deal of respect, but as the Court of Appeals noted, we are not bound by Sixth Circuit precedent. *Commonwealth v. Kentec Coal Co., Inc.,* 177 S.W.3d 718 (Ky.2005); *ASARCO Incorporated v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (noting state court authority to interpret federal law); *United States ex rel. Lawrence v. Woods,* 432 F.2d 1072 (7th Cir.1970) (opining that because only the Supreme Court has authority to review state court interpretations of federal law, only its decisions are binding on those courts). Having carefully considered First Amendment precedent, I am convinced that *Carver,* and now this Court, relies unduly on a strained and dubious reading of *Clements v. Fashing,* a single opinion addressing facts far different from those before us. Moreover, both *Carver* and the majority in this case disregard the Supreme Court's *Pickering* and *Branti* line of decisions recognizing that while the First Amendment rights of public employees are subject to significant curtailment, they nevertheless remain protected against arbitrary or unreasonable state interference.

The majority justifies its disregard of that precedent by invoking what it refers to as "candidacy *per se,*" a sort of metaphysical "candidacy" divested of a real candidacy's speech and associational attributes. Since "candidacy" in this rarefied sense excludes, by definition, any sort of communicative activity, it cannot, the Court concludes, implicate the First Amendment. The fact that candidacy may be regulated as such, however, without regard for any particular candidate's views or message, does not mean that "candidacy" somehow exists independently of real candidates, a sort of content-less ideal to which candidates attach their particular concerns. It means only that candidacy is like other forms of speech, which likewise are subject to reasonable, viewpoint neutral regulation. There is no such thing as "candidacy" apart from real candidates' speech and associational aspirations, and there is no regulation of candidacy that does not bear upon these interests. The Court of Appeals for the First Circuit has illustrated this point nicely by identifying several ways in which candidacy as such implicates First Amendment concerns:

> The fact of candidacy alone may open previously closed doors of the media. The candidate may be invited to discuss his views on radio talk shows; he may be able to secure equal time on television to elaborate his campaign program; the newspapers may cover his candidacy; he may be invited to debate before various groups that had theretofore never heard of him or his views. In short, the fact of candidacy opens up a variety of communicative possibilities that are not available to even the most diligent of picketers or the most loyal of party followers.

*Mancuso v. Taft,* 476 F.2d 187, 196 (1st Cir.1973) (*modified on other grounds in Magill v. Lynch,* 560 F.2d 22 (1st Cir. 1977)). *See also Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (discussing how even neutral restrictions that affect a candidate's access to expressive outlets strongly implicate the First Amendment). Similarly, as a focal point in the public debate, a candidate enjoys opportunities for association unavailable to non-candidates.

Even if there were meaning in the Court's "candidacy *per se* " distinction, the distinction would not apply here because, to the extent Cook was discharged because

of her candidacy, it was not because she was running for public office as such, but because *her particular candidacy was in opposition to Popplewell.* That particular candidacy thus expressed a nascent message on a matter clearly of public concern: that Cook would be a good County Clerk and a better one than her current boss, Popplewell. The burdening of that message implicates *Pickering* and *Branti,* under the approach adopted by the majority of federal courts, and so requires some modicum of justification. *Click v. Copeland,* 970 F.2d 106 (5th Cir.1992).[36]

Under *Branti* and the position the majority of courts have taken on this issue, Cook's rival candidacy would justify her dismissal if the effective performance of Cook's particular deputy clerk position required her to remain politically loyal to and affiliated with Popplewell. In short, some government employees' positions, by their very nature, involve such confidential relationships or discretionary authority as to justify dismissal without regard to evidence of the impact of the dismissed employee's conduct or political affiliation on the operation of the office. However, in *Caudill v. Hollan,* 431 F.3d 900 (6th Cir. 2005), the U.S. Court of Appeals for the Sixth Circuit ruled that deputy county clerks in Kentucky generally perform clerical duties and, thus, do not wield the discretionary authority or provide the sort of confidential advice on matters of policy that would justify their patronage dismissal. As Popplewell has made no attempt to refute or to distinguish *Caudill,* which appears well-taken on this point, I cannot say that Cook's dismissal was justified under *Branti*'s exception for certain employment positions.

Cook's dismissal would be justified under the *Pickering* balancing test, however, if her candidacy interfered with the efficient functioning of the County Clerk's office. In balancing the employee's interest as citizen in speaking on a matter of public concern and the government's interest as employer in maintaining an efficient workplace, the Supreme Court has explained that pertinent considerations include "the manner, time, and place of the employee's expression," "the context in which the dispute arose," and "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (citations omitted).

Applying these factors, several courts have held or noted that a subordinate's candidacy against his or her boss is so apt to be disruptive of a small governmental office that preemptive dismissal or mandatory leave of absence may be justified. *Randall v. Scott,* 610 F.3d at 714; *Jantzen v. Hawkins,* 188 F.3d at 1258; *Caruso v. De Luca,* 81 F.3d 666, 670–71 (7th Cir. 1996); *Bart v. Telford,* 677 F.2d 622, 624–25 (7th Cir.1982); *Deemer v. Durell,* 110 F.Supp.2d 1177, 1179–82 (S.D.Iowa 1999); *Warren v. Gaston,* 55 F.Supp.2d 1230, 1236 (D.Kan.1999).

In *Click v. Copeland,* 970 F.2d at 112–13 and *Jordan v. Ector County,* 516 F.3d at 299, on the other hand, the Fifth Circuit

---

**36.** Under *Branti,* public employees who are in positions not involving "confidence" or policymaking cannot be dismissed simply for having supported the "wrong" candidate. The majority position suggests an obvious query: why should that rule not also apply when the "wrong" candidate happens to be the employee herself? *Murphy v. Cockrell,* 505 F.3d 446 (6th Cir.2007).

held that where the adverse employment action was delayed and there was no evidence that the subordinate's candidacy had in fact caused disruption in the office, the balance tipped in favor of the employee's rights. In *Murphy v. Cockrell*, 505 F.3d 446, 453 (6th Cir.2007), too, the Sixth Circuit held that mere office tension resulting from a subordinate's rival candidacy and campaign speech, where there was no evidence that the tension had impaired office functions, was not enough to justify the subordinate's dismissal. Distinguishing *Carver*, the Court held:

> The teaching of [the U.S. Supreme Court decisions in *Bullock*, *Clements* and *Connick* ] leads us to believe that if Murphy supported another candidate in the race for Montgomery County PVA other than Cockrell [her boss], such conduct would be protected by the First Amendment. In fact, if Murphy had simply actively campaigned against Cockrell, but had not become a candidate herself, her speech would be protected. Cockrell argues that the fact that Murphy was a candidate, and supported herself as such, is reason enough under *Carver* to justify Murphy's termination. We decline to extend *Carver* in such a manner. *Carver* itself distinguished cases in which candidates had been singled out or treated differently based on their political viewpoints or expressions, noting that Carver was dismissed solely based on the fact of his

[sic] candidacy, not his [sic] political views. We expressly recognized in *Carver* that while the mere fact of candidacy was not constitutionally protected, the expression of one's political belief still fell under the ambit of the First Amendment. Accordingly, we now hold that the fact that Cockrell fired Murphy due to Murphy's political speech *during the course of her campaign*—rather than the mere fact of Murphy's candidacy—is enough to trigger protection under the First Amendment.

505 F.3d at 451.

While Cook's fledgling candidacy may have given rise to disruptive tension at the Russell County Clerk's Office, which comprises two small branches, one in Jamestown and the other in Russell Springs, the record is not sufficiently developed to draw that conclusion.[37] Popplewell maintains, moreover, that she dismissed Cook not because her candidacy disrupted the office, but because of poor work performance. Nevertheless, in Cook's deposition, she admits that while at work she campaigned, telling County Clerk customers that she was running for Clerk and asking for their support, and discussing her campaign with co-workers. Clearly that is activity itself disruptive of the office's appropriate functions and virtually certain to engender conflict and distraction.[38] Cook's dismissal to curtail and to forestall office efficiency problems was justified under *Pickering*, and thus the trial court's summary judg-

---

37. The record does reflect that about two weeks before Cook was terminated she was transferred from the Russell Springs office to the County Clerk's main office in Jamestown where Popplewell worked daily.

38. Campaigning in a government office through conversations with the public or co-workers is indisputably disruptive. *See, e.g., Jordan v. Ector County*, wherein the Fifth Circuit, engaging in *Pickering* balancing, stated: "We need not pause long on the balancing,

for there is no record evidence that Jordan's political activities caused disruptions that would justify termination; Defendants concede the evidence of disruption is "scant." Jordan's political activities constitute core First Amendment activity, and there is no evidence that any campaigning or electioneering occurred at work or on County time. Morgan testified that Jordan was helpful, honest, hard working, and capable. 516 F.3d at 299.

ment may be affirmed on that ground. While in my view this is the better approach to the constitutional question the Court takes up, the fact remains that under either approach the result is the same, and we should therefore refrain from choosing.

Two other points warrant some discussion. First, the majority deems itself bound to the "no right to candidacy" position by *Com. ex rel. Stumbo v. Crutchfield,* 157 S.W.3d 621 (Ky.2005), in which this Court addressed an equal protection challenge to Kentucky Revised Statute (KRS) 160.180, an anti-nepotism statute disqualifying as candidates for seats on the board of education persons with relatives employed by the school district. At the outset of its analysis the *Crutchfield* Court discussed the appropriate level of judicial scrutiny:

> The initial inquiry is to determine what standard of scrutiny applies when testing the constitutionality of KRS 160.180. . . . Governmental classifications that do not target suspect classes or groups or fundamental interests are subject only to rational basis review. . . . The challenged statute does not affect a suspect class. . . . It does not inflict injury to Appellee's right to candidacy, because no such constitutional status exists. . . . Therefore, a rational basis test is the appropriate constitutional standard.

157 S.W.3d at 623–24 (citations omitted). Clearly, all the *Crutchfield* Court needed to say, and in my view all it intended to say, was that candidacy is not a fundamental right necessitating strict scrutiny. The United States Supreme Court has said as much. To the extent that the *Crutchfield* Court meant to say more than that, the opinion is dicta and should not be thought to apply to this very different set of facts. There is reason to believe, however, that

the Court did not mean to say more. The case the *Crutchfield* Court cited for its "no such constitutional status exists" statement is *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), in which the Supreme Court addressed an equal protection challenge to certain Texas filing fee statutes. Addressing the appropriate standard of review, the Court observed that

> [t]he initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. . . . [T]he Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. The existence of such barriers does not of itself compel close scrutiny.

405 U.S. at 142–43, 92 S.Ct. 849. With all due respect, my colleagues in the majority cannot seriously claim to find in that passage any hint, much less an unambiguous declaration, that candidacy enjoys *no* First Amendment protection. The *Crutchfield* Court could not either, and I would not attribute to it any such intent.

Finally, the majority declares itself unwilling to recognize a right as seemingly vague as a right to candidacy. In short, if there is such a right, why has no one been able to say what it is? What the majority takes for uncertainty and vagueness, however, is rather the caution with which courts appropriately proceed when sailing in uncharted constitutional waters. As noted above, constitutional rulings are to be avoided if possible, and a corollary of that principle is that if a ruling is required it should be as narrow as possible. This is a caution, moreover, insisted upon by the Supreme Court. As noted above, for example, in *Clements v. Fashing* the Court

**350**

rejected the idea of "litmus paper tests" for constitutional rights, and explained instead that

> [d]ecision in this area of constitutional adjudication [restrictions on candidacy] is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions.

457 U.S. at 963, 102 S.Ct. 2836 (citations omitted). This same insistence on careful, case-by-case balancing of interests recurs throughout the *Pickering* and *Branti* line of cases. Although this approach does not result, at least not in the short term, in the sort of bright-line rules the majority desires, it does allow the law to evolve in a thoughtful and responsible manner. As the cases discussed above show, this approach does not rely on absolutist assertions or absolutist denials of candidacy rights. It recognizes rather, as common sense suggests, that our citizens have a right, protected by the First Amendment, to run for office. It is a right stronger in some circumstances than others and a right subject to numerous countervailing interests. It is a right nonetheless, and so at the very least, is not to be denied arbitrarily. A compelling example of arbitrariness is *Randall v. Scott*, wherein an assistant prosecutor was dismissed solely because he was running for county commissioner, a position his boss's spouse also intended to seek. Clearly, this dismissal was based only on the employer's personal interest, an interest that would not justify encroachment on the right to candidacy under a *Pickering/Branti* analysis. Under the Court's ruling today, however, a similar employee in Kentucky would have no redress in our state courts because the majority has concluded that a right to candidacy is simply not protected by the First Amendment.

### CONCLUSION

In sum, because Cook has not adequately alleged an "official capacity" cause of action, and because her work-place campaigning would not be protected under any reading of the First Amendment, I would affirm the summary judgment dismissing her suit on these grounds and leave for another day any further delineation of candidacy's First Amendment status. The Court having reached that question, however, I do not join the majority's conclusion that "candidacy *per se* " has no First Amendment implications. The majority disregards a growing body of authority under the Supreme Court's *Pickering* and *Branti* decisions and adopts a minority view that has attracted few adherents since it was first articulated twenty years ago. Respectfully, therefore, I concur in the result the Court reaches, but not in its opinion.

MINTON, C.J., and NOBLE, J., join.